CJ26 6334 -

M 41

*1066313666*

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

AUG - 6 2026

RICK WARREN
COURT CLERK
125

# IN THE DISTRICT COURT OF OKLAHOMA COUNTY
# STATE OF OKLAHOMA

| | |
|---|---|
| Rachel Macon, as Administrator and Personal Representative of the Estate of Marquiel D. Ross, Deceased; and Danielle Ross, individually, *Plaintiffs,* | CJ - 2026 - 6334 |
| v. | Case No. ____________ |
| State of Oklahoma *ex rel.* Oklahoma Department of Corrections; Kameron Christopher Harvanek; Brittany Ann Chastang; Destine Hayes; Jacob Killion; Bradley Mooney; Tommy Lee Stranahan; Kimberly Renee Hall; Ashley L. Bills; Justin Russell Jordan; Dustin Carl Henry; Dustin Eugene Willbanks; Nanci Sue Battles; and John and Jane Does 1–10, all individual Defendants sued in their individual capacities, *Defendants.* | JURY DEMANDED<br>ATTORNEY LIEN CLAIMED |

## PETITION AND JURY DEMAND

Plaintiffs Rachel Macon, as Administrator and Personal Representative of the Estate of Marquiel D. Ross, deceased, and Danielle Ross, individually, state the following claims against the above-named Defendants:

1. This action concerns Marquiel Dae'juan Ross's unconstitutional over-detention, punitive transfer, unsafe housing, failure to protect, deliberately indifferent and delayed emergency response, unnecessary restraint and movement, and death. It also concerns coordinated efforts to obscure missed observations and the timing and circumstances of his death through scene disturbance, evidence mishandling, false or incomplete records and family communications, delayed notice, and premature cremation-related steps.

2. Ross was approximately five feet five inches tall, weighed about 130 pounds, and was serving two years for a nonviolent offense. On September 12, 2024, at the Oklahoma State Penitentiary ("OSP"), a substantially larger cellmate serving two fifteen-year sentences for second-degree burglary and felonious firearm possession beat him to death.

Exhibit 2

3. This Petition asserts federal civil-rights and conspiracy claims and Oklahoma claims against twelve named individuals and Doe Defendants, plus Oklahoma claims against the State of Oklahoma *ex rel.* Oklahoma Department of Corrections ("State *ex rel.* ODOC"). Individual claims rest on each person's conduct, direction, approval, ratification, knowing failure to intervene, or knowing participation in the concerted arrangements below.

**PARTIES**

4. Plaintiff Rachel Macon, a Tulsa County resident, is the duly appointed Administrator and Personal Representative of Ross's Estate and asserts the representative claims that survived his death or arose from it.

5. Plaintiff Danielle Ross, Ross's mother and next of kin, resides in Tulsa County. She sues individually only for injuries directly caused by Defendants' post-death conduct; damages arising from Ross's injury and death are sought through the Personal Representative.

6. State *ex rel.* ODOC is the governmental defendant required by 51 O.S. §§ 153 and 163. ODOC had custody of Ross and controlled sentence administration, release, transfer, classification, housing, security, medical response, recordkeeping, family notification, and the remains-related functions at issue. Plaintiffs seek State liability for actionable within-scope ODOC employee torts.

7. Kameron Christopher Harvanek was Warden of the Howard McLeod Correctional Center ("HMCC"); Brittany Ann Chastang, Destine Hayes, Jacob Killion, Justin Russell Jordan, and Dustin Carl Henry were OSP correctional officers; Bradley Mooney and Dustin Eugene Willbanks were OSP supervisors; Tommy Lee Stranahan was the ODOC agent or investigator identified in ODOC's Incident Report concerning Ross's death (the "Incident Report"); Kimberly Renee Hall was a correctional health-services or medical administrator; Ashley L.

Exhibit 2

Bills was the licensed practical nurse involved in the response; and Nanci Sue Battles was an OSP Deputy Warden. Each is sued individually.

8. John and Jane Does 1–10 are unidentified ODOC personnel ascertainable from sentencing, release, classification, roster, post-order, log, video, report, audit-trail, communication, and chain-of-command records controlled by Defendants or ODOC. Plaintiffs will conform the designations through discovery.

9. "Release-Record and Transfer Does" calculated, maintained, reviewed, or acted on Ross's release date, answered continued-confinement inquiries, or approved or effectuated his transfer; with Harvanek, they are the "Release-Record and Transfer Defendants." "Cell-Assignment and Observation Does" selected or approved Ross's cellmate, reviewed classification, compatibility, or separation information, or performed or recorded rounds, checks, observations, or counts; with Chastang, they are the "Cell-Assignment and Observation Defendants."

10. "Emergency-Response Does" received or relayed Harris's warning; responded to Cell 18; secured Harris; evaluated, treated, or moved Ross; or supervised the response; with Chastang, Hayes, Killion, Mooney, Bills, Jordan, and Henry, they are the "Emergency-Response Defendants." "Death-Scene and Investigation Does" preserved or logged the scene, assisted investigators, handled evidence, or managed Harris's post-death custody, interview, placement, assessment, or testing; with Killion, Mooney, Stranahan, Willbanks, and Battles, they are the "Death-Scene and Investigation Defendants."

11. "Family-Notification, Records, and Remains Does" notified or attempted to notify Ross's family; prepared, altered, approved, or transmitted incarceration or death records; communicated with the Medical Examiner or funeral home; or initiated or authorized disposition; with Hall, they are the "Family-Notification, Records, and Remains Defendants." Groups may overlap; a label identifies function but does not allege every member performed every group act.

Exhibit 2

12. Each individual Defendant acted under color of Oklahoma law. Counts I–III seek damages only from participating individuals in their individual capacities. State *ex rel.* ODOC appears only in the Oklahoma counts expressly naming it.

## JURISDICTION AND VENUE

13. This Court has general jurisdiction under Okla. Const. art. VII, § 7, concurrent jurisdiction over claims under 42 U.S.C. § 1983, and jurisdiction over the related Oklahoma-law claims, including claims under the Oklahoma Governmental Tort Claims Act ("OGTCA"), 51 O.S. §§ 151–172.

14. Venue lies in Oklahoma County under 51 O.S. § 163(A), 57 O.S. § 566.4(G)(1), and 12 O.S. § 139 because State *ex rel.* ODOC resides and may be summoned here, and ODOC personnel with multicounty duties are sued. The sentence, release, transfer, housing, observation, response, death-scene, reporting, and post-death allegations arise from one series of transactions and present common issues; joinder is proper under 12 O.S. § 2020(A).

## RELATED FEDERAL ACTION, REFILING, AND TIMELINESS

15. On April 7, 2025, Plaintiffs timely filed an Oklahoma County action arising from these events against ODOC, Harpe, Quick, and others. Defendants removed it to the Western District of Oklahoma, Case No. CIV-25-472-CMS.

16. On June 11, 2025, the federal court dismissed ODOC without prejudice because the 11th Amendment barred federal damages relief and ODOC was not a § 1983 "person." The order did not decide the merits of the Oklahoma tort claims or OGTCA-notice compliance. The 11th Amendment does not bar a compliant state-court OGTCA action naming State *ex rel.* ODOC.

17. After amendment, the federal action included the twelve individuals named here. On March 12, 2026, the court dismissed them without prejudice under Rule 4(m) for nonservice, without

Exhibit 2

reaching the merits. On May 19, 2026, it denied leave to reassert them without deciding futility; reconsideration was later denied.

18. The federal action continues against Harpe and Quick, neither a Defendant here; no claim against State *ex rel.* ODOC remains there. This is Plaintiffs' first refiling against the twelve individuals following the March 12 non-merits dismissal. It asserts the same interests, claims, parties, and occurrences within one year and is preserved by 12 O.S. §§ 100 and 2003, although those individuals were not served in the original action.

19. Plaintiffs timely sued State *ex rel.* ODOC, which appeared and defended. The June 11, 2025, order dismissed ODOC without prejudice and otherwise than on the merits. Because it resolved the rights and liabilities of fewer than all parties without Rule 54(b) certification, it neither ended the federal action nor started § 100's deadline. It was unappealable. *Cole v. Josey*, 2019 OK 39, ¶¶ 4, 12–15, 457 P.3d 1007; *Hagy v. Am. Honda Motor Co.*, 125 F. Supp. 2d 456, 459 (W.D. Okla. 2000). This timely refiling follows that dismissal. If finality is required, Plaintiffs alternatively request a stay, not dismissal, until the dismissal becomes final for § 100 purposes.

20. The federal claims also fall within Oklahoma's § 1983 limitations period or, alternatively, § 100. Any claim subject to 12 O.S. § 95(A)(11)'s one-year period is likewise saved, and the wrongful-death claim independently falls within 12 O.S. § 1053(A)'s two-year period.

## OGTCA NOTICE, STATE LIABILITY, AND ALTERNATIVE OUTSIDE-SCOPE ALLEGATIONS

21. On January 6, 2025, counsel mailed and emailed ODOC a detailed written notice of Plaintiffs' wrongful-death and negligence claims and intent to seek money damages; the correspondence included an email to ODOC attorney Kari Hawkins.

22. The notice described Ross's asserted over-detention, maximum-security transfer despite his nonviolent history, placement with a dangerous cellmate, deficient supervision and checks, policy violations, and death; identified ODOC; demanded $10,000,000; supplied counsel's

Exhibit 2

contact information; and requested preventive remedies. It asserted existing claims for compensation and gave the State a full opportunity to investigate, preserve evidence, evaluate settlement, correct practices, and plan for liability, satisfying 51 O.S. § 156.

23. All conditions precedent occurred or were performed. The January 6 demand satisfied 51 O.S. §§ 156–157 and 57 O.S. § 566.4(B)(2); because it was not approved in full within ninety days, it was deemed denied before the April 7 action, which was filed within the 180-day period prescribed by § 157(B). This first refiling is preserved by § 100.

24. Under 51 O.S. §§ 153(A) and 163(C), State *ex rel.* ODOC is liable for actionable within-scope torts. Alternatively, under § 153(C), each individual named in an Oklahoma tort count acted outside the scope through willful, malicious, or bad-faith conduct undertaken for personal, retaliatory, self-protective, or concealment-related purposes rather than to serve ODOC.

25. As applicable, outside-scope conduct included unauthorized punitive transfer or detention; knowing exposure to extreme danger; deliberate skipping, falsification, acceptance, or concealment of checks; deliberate emergency delay; unnecessary restraint or manipulation of an unresponsive or deceased person; disturbance of Ross, the cell, or evidence; suppression, contamination, manipulation, or concealment of evidence; false, incomplete, or misleading logs, reports, statements to next of kin, or records; interference with control of Ross's remains; premature cremation; and knowing furtherance of the concerted arrangements. It was not a good-faith mistake, ordinary negligence, or poor performance. Alternatively, within-scope conduct supports State liability and outside-scope conduct supports individual liability; neither theory waives the other.

Exhibit 2

## FACTUAL ALLEGATIONS

### A. Sentence, Release Records, and Punitive Transfer

26. Ross's two-year sentence arose from a nonviolent joyriding offense. His deferred sentence was accelerated principally because he could not pay about $1,366 in probation fees; he otherwise had no significant criminal history and was classified nonviolent.

27. Around November 2023, while Ross was being transported from HMCC toward the Lexington Assessment and Reception Center, officials diverted him to OSP, the maximum-security prison called "Big Mac." On information and belief, Harvanek authorized, facilitated, recommended, or knowingly acquiesced in the diversion to punish Ross for complaining or being perceived as troublesome, or because of personal animus – not for a legitimate classification or penological reason. Knowing that OSP materially increased the danger to a small, nonviolent inmate, Harvanek permitted the transfer and failed to correct it after receiving placement and release information.

28. ODOC records displayed conflicting projected or discharge dates – November 19, 2023, and July 8, 2024. Subject to the official sentencing, credit, and discharge records, Ross was entitled to release no later than July 8, 2024; after his death, ODOC again changed the displayed date to September 12, 2024. The family repeatedly asked why he remained confined. On July 24, 2024, they confirmed he was still incarcerated and were told paperwork was incomplete; in August 2024, they received inconsistent explanations – that release was imminent or that no release address could be verified.

29. Those inquiries, release records, offender data, and institutional communications gave the Release-Record and Transfer Defendants actual notice of continued confinement beyond the operative date. Although able to investigate, correct the record, or initiate release, they

Exhibit 2

deliberately did not. No hearing, warrant, new sentence, revocation order, or other process authorized the continued imprisonment that ended only with Ross's death.

**B. Placement with a Known Violent Cellmate and Missed Checks**

30. Late on September 11, 2024, OSP officials placed Ross with Justin Harris in a two-person cell. Harris weighed about 250 pounds, had a documented history of violence and prior cellmate batteries, and was later charged with Ross's murder. The Incident Report listed Ross's two-year stolen-vehicle sentence, Harris's two fifteen-year sentences for burglary and felonious firearm possession, and materially different street-gang subsets.

31. The cell-selection personnel had both prisoners' classification, separation, disciplinary, gang, and safety data yet made or approved the pairing despite its obvious and substantial danger; they are the Cell-Assignment and Observation Does. OSP policy and ordinary practice also required direct observation, counts, security checks, accurate logs, and immediate action upon a report that a cellmate was dead or in distress. The identifying rosters, post orders, count sheets, logs, video, radio traffic, and reports are controlled by Defendants or ODOC.

32. At about 2:08 p.m. on September 12, Chastang was conducting the 2:00 p.m. count on Unit C, Quad 4. The Incident Report says she passed Cell 18, thought Ross and Harris "appeared to move," and continued. After she reached Cell 25, Harris called her back, but she finished the count before returning. Harris then said, "I just woke up and I think my cellie is dead." Chastang notified the control room and Hayes.

33. Hayes radioed Mooney and reached Cell 18 at about 2:12 p.m. Although Harris pointed to a motionless Ross on the top bunk and Chastang had relayed his report, Hayes first told Harris to have Ross come speak. Harris responded that Ross "was dead when [he] woke up"; Hayes then called medical. At about 2:13, Mooney, Killion, Jordan, and Henry arrived, Harris was restrained and removed, and Bills brought a trauma bag.

Exhibit 2

34. Ross was motionless and unresponsive and posed no threat. Without a documented medical or security reason, Killion and Henry cuffed him and manipulated him from the top bunk to the floor; the Incident Report identifies no resistance, threat, escape risk, or medical basis. On information and belief, Mooney, the responding supervisor, and Jordan observed or assisted in the restraint and movement; directed, approved, or ratified it; or knowingly failed to stop it.

35. Bills documented that Ross was unresponsive, cold, stiff, and pulseless; that substantial blood was on the bed and coming from the back of his head; and that the automated external defibrillator ("AED") detected no rhythm – findings incompatible with movement minutes earlier and with any need to restrain him for control. Personnel performed multiple rounds of cardiopulmonary resuscitation ("CPR"); the Incident Report identifies Killion and Henry as continuing to handle Ross during transport. On information and belief, Mooney and Jordan observed or contemporaneously learned of those findings yet directed, approved, or ratified the manipulation; assisted in it; or failed to stop it. Bills continued the response without reconciling the recent-movement account. Ross reached the institutional emergency room by gurney at about 2:28 p.m.; Advanced Practice RN Nurse Kevin Garrison pronounced him dead at about 2:39.

36. ODOC procedure OP-050108 defined handcuffs as restraints, prohibited unnecessary force, and allowed proportionate restraint only to prevent injury or meet a legitimate security need. Ross's condition supplied none. Cuffing before assessment, manipulating stiff limbs, and continuing the restraint after no threat was apparent departed from policy and support deliberate, punitive, staged, or concealment-driven conduct. ODOC's Inmate Death nursing protocol, MSRM 140117.01.15.3, identifies *rigor mortis* as stiffness making a corpse's limbs hard to move or manipulate and lists CPR and AED as interventions "if indicated." Bills knew the findings she documented; Killion and Henry encountered the condition; and, on information and belief, Mooney and Jordan observed it or received Bills's findings.

Exhibit 2

37. Chastang's 2:08 movement account is materially inconsistent with the coldness, rigidity, pulselessness, absent rhythm, and blood documented minutes later, supporting an inference that her observation was cursory, inaccurate, or not performed and that earlier checks were missed, falsified, or meaningless. The pairing and missed or falsified observations eliminated protection and timely intervention; Chastang and Hayes additionally disregarded an obvious emergency through their later conduct.

### C. Death-Scene Handling, Records, and Family Notification

38. At about 2:30 p.m., Mooney assumed control of Cell 18 and kept the crime-scene log until about 3:00. He knew that Ross had been cuffed and moved and that the cell and body position had been disturbed. On information and belief, Mooney directed, approved, or ratified material disturbances; omitted them from the log; and failed to ensure that original positions, restraints, blood, bedding, and other evidence were fully photographed, recorded, and preserved.

39. Stranahan was notified at about 2:35 that agents from the Office of Inspector General ("OIG") would respond – before Ross's pronouncement and a further movement at about 2:45. ODOC procedure barred removal before OIG authorization and required reporting every medically necessary disturbance. The Incident Report identifies neither authorization for the 2:45 movement nor a complete account of earlier restraint and manipulation. On information and belief, Stranahan knowingly allowed unauthorized movement or authorized, approved, or ratified it despite incomplete preservation. Killion logged the post-pronouncement scene; OIG arrived about 3:50, the Medical Examiner about 5:09, and a funeral-home representative departed with Ross's body about 5:42.

40. At about 3:30, Hall attempted to contact Ross's next of kin using telephone numbers in the Inmate & Community Offender Network ("ICON"); at 6:48 she contacted Tulsa police; at 8:45 she recorded that police had not found Ross's mother at the listed address. As the assigned

administrator, Hall could access institutional identity, contact, visitation, release-address, medical, emergency-contact, and family-inquiry records. On information and belief, she knowingly confined the search to incomplete data, failed to use readily available alternatives, participated in or approved later misleading communications or records, or failed to correct them after learning the truth, thereby delaying meaningful notice and the family's ability to exercise control over Ross's remains.

41. The Incident Report says Hayes strip-searched and secured Harris; Hayes and Killion moved him from the shower to a law cage about 2:26; Willbanks assumed watch over him at about 2:52; Battles and Willbanks escorted him to an OIG interview about 4:17 and later participated in placement, assessment, or testing; and Willbanks and Mooney gave him different clothing about 4:45. Those Defendants thereby had custody of Harris and control over his statements, clothing, biological material, and other evidence. The Incident Report does not establish collection, separate bagging, labeling, preservation, or a complete pre-change chain of custody for his original clothing or other evidence. On information and belief, they knowingly failed to preserve or document that evidence, ratified its incomplete handling, or used the resulting gaps to obscure the timing, mechanism, and circumstances of Ross's death.

42. ODOC procedures OP-140111 and OP-040117 required prompt emergency-contact notice, immediate protection of a suspicious-death scene, a complete entrant-and-purpose log, reporting every disturbance, and release of the scene or body only through authorized channels. OP-040109 required protection and bagging of contamination-prone evidence, minimal handlers, and documentation of every transfer. These rules notified Mooney, Killion, Stranahan, Hayes, Willbanks, Battles, Hall, the Death-Scene and Investigation Does, and the Family-Notification, Records, and Remains Does of their duties; their departures from required practices concerning

Exhibit 2

restraints, the scene, evidence, notification, records, and remains support an inference of knowledge, intent, ratification, and concealment.

43. On September 13, 2024, ODOC falsely told the family that Ross had transferred to higher security. Other inmates disclosed his death; meaningful official notice came around September 19, 2024. On information and belief, without written authorization from Danielle or any claimant with equal or higher priority under 21 O.S. § 1158, ODOC personnel caused a funeral provider to initiate cremation through an ODOC-controlled request or instruction. The family prevented cremation and viewed Ross's severely injured body; the autopsy documented multiple blunt-force injuries consistent with a beating.

44. Although Ross died on September 12, ODOC personnel later reported September 17 as the date of death and altered or mishandled incarceration, transfer, discharge, and death records or reported inconsistent information in them. The personnel who supplied the false transfer account, entered or approved the wrong death date, altered or obscured release and death records, or initiated cremation steps are designated Family-Notification, Records, and Remains Does and are identifiable through call logs, audit trails, Medical Examiner and funeral-home communications, and disposition authorizations.

45. The false transfer, wrong death date, inconsistent release records, delayed notice, and cremation activity were not clerical errors; they imply deliberate concealment of the timing and circumstances of Ross's death and interference with family control of his remains through coordinated ODOC communications, records, approvals, and provider contacts. On information and belief, Hall, Battles, Stranahan, Mooney, Killion, Willbanks, the Family-Notification, Records, and Remains Does, and the Death-Scene and Investigation Does participated in, directed, approved, or ratified those acts; transmitted communications or records furthering those acts; or knowingly failed to correct them. Danielle learned of her son's death from other inmates

Exhibit 2

while State personnel withheld or contradicted the truth, causing severe grief, shock, anxiety, helplessness, and mental anguish and impairing her ability to grieve, investigate, and decide about his remains.

**D. Concerted Arrangements and Defendant-Specific Furtherance**

46. The coordinated decisions, communications, restraints, movements, logs, records, explanations, and disposition activity support an inference that the participating individuals reached express or tacit understandings. Each participant knew the essential nature and scope of the arrangement that participant joined and knowingly advanced it by performing, directing, approving, ratifying, concealing, or failing to prevent an act.

47. First, on information and belief, Harvanek and the Release-Record and Transfer Does acted in concert to confine Ross after his lawful discharge date, divert him to OSP for punishment, and preserve the detention through incomplete paperwork, inconsistent information, refusal to correct records, and concealment of the operative date. Harvanek advanced it by authorizing, facilitating, recommending, or acquiescing in the diversion and failing to end confinement after notice; the Does maintained or acted on inconsistent dates, shifted explanations, withheld release action, and continued confinement.

48. Second, on information and belief, Chastang and the observation personnel among the Cell-Assignment and Observation Does acted in concert to avoid meaningful direct observations and to create, accept, or preserve accounts falsely presenting the required checks and the count as having been completed. Chastang advanced it through the implausible movement account, completion of the count, delayed verification, and an account contrary to objective signs; the Does skipped or performed cursory rounds, falsely documented them, or concealed the omissions.

49. Third, on information and belief, Chastang, Hayes, Mooney, Killion, Henry, Bills, Jordan, and the Emergency-Response Does acted in concert to portray a recent discovery and timely

Exhibit 2

rescue and obscure missed observations, Ross's condition, and the time of death. Chastang supplied the movement account and caused the delay; Hayes failed to treat the death report as an emergency and controlled Harris; Mooney supervised or ratified restraint and movement and controlled the first log; Killion and Henry cuffed, manipulated, moved, and handled Ross; Bills participated despite her contrary findings; and Jordan assisted the response, remained present, and failed to intervene or ensure truthful documentation.

50. Fourth, on information and belief, Killion, Mooney, Stranahan, Hall, Willbanks, Battles, the Death-Scene and Investigation Does, and the Family-Notification, Records, and Remains Does acted in concert to obscure the timing and circumstances of death, antecedent failures, and remains handling. They used unauthorized or incompletely reported body movement and scene disturbance; misleading scene, evidence, custody, medical, notification, death, transfer, or release records; an incomplete chain of custody for Harris-related evidence; delayed or false family communications; and premature cremation. Any release or response participant who knowingly created, adopted, transmitted, or preserved a false report for that purpose also joined the arrangement.

51. The radio and telephone calls, messages, audit trails, authorizations, drafts, reports, video, and supervisory instructions establishing each agreement's details are controlled by Defendants or ODOC. The chronology and identified acts support knowing coordination; Plaintiffs will conform the membership and details of each arrangement to the evidence obtained in discovery.

**COUNT I: 42 USC § 1983: 8TH AMENDMENT FAILURE TO PROTECT, DELIBERATE INDIFFERENCE TO AN OBVIOUS EMERGENCY AND FAILURE TO INTERVENE**

*(Estate against Chastang, Hayes, Killion, Mooney, Bills, Jordan, Henry, the responsible Cell-Assignment and Observation Does, and the responsible Emergency-Response Does)*

52. The Estate incorporates the preceding paragraphs. Ross had a clearly established right to reasonable protection from a substantial risk of serious inmate-on-inmate violence and to be free from correctional officials' deliberate indifference to an obvious threat to his life and safety.

Exhibit 2

53. The cell-assignment personnel knew from Harris's classification, discipline, separation, and housing records that he posed a substantial risk to a small, nonviolent cellmate but approved the pairing. The observation personnel knew from required checks, missing observations, count conditions, visible circumstances, and records that Ross faced or had faced a substantial risk of serious harm, yet failed to conduct meaningful observations, falsely or inaccurately recorded compliance, or ignored gaps that concealed the assault.

54. Chastang relied on a cursory or inaccurate observation, completed the count, and delayed verification and medical aid; Hayes initially rejected the death report; Killion and Henry restrained and manipulated Ross; and Mooney directed or ratified that conduct or failed to intervene. Those acts reflected deliberate indifference. On information and belief, Mooney and Jordan knew of Ross's condition; Jordan nevertheless assisted and failed to intervene despite a realistic opportunity; and Bills knowingly preserved the recent-rescue account without reconciling her contrary findings. Each failed to take reasonable action available within that person's role.

55. The Cell-Assignment and Observation Defendants' deliberate indifference caused the assault and loss of an opportunity for protection and earlier intervention; Ross remained exposed during missed checks and delayed discovery. If Ross remained alive during any part of the response, delay, restraint, manipulation, assessment interference, and failures to intervene caused added injury, conscious pain or fear, and delay in care, thereby causing or contributing to death. Each participant is liable for that participant's conduct and acts furthering a conspiracy that the participant knowingly joined; restraint or manipulation after apparent death also supports the Oklahoma claims. The Estate seeks compensatory damages, punitive damages against individuals, costs, and § 1988 fees.

Exhibit 2

**COUNT II. 42 U.S.C. § 1983 – 14TH AMENDMENT PROLONGED DETENTION**
*(Estate against the individual Release-Record and Transfer Defendants)*

56. The Estate incorporates the preceding paragraphs. Ross had a clearly established liberty interest in release at sentence expiration. Official dates, sentence records, offender data, family inquiries, and communications gave the Release-Record and Transfer Defendants actual notice that no authority supported continued confinement. Those Defendants had authority and an opportunity to investigate, correct the error, and release Ross. They intentionally refused to act or were deliberately indifferent to the need to do so; Ross received no hearing or corrective process.

57. Plaintiffs challenge any later computation claiming fourteen days remained on September 12, 2024: the underlying sanction was unauthorized or imposed without required process, and the credit, start-date, or discharge-date inputs were wrongly applied or inconsistent with earlier displayed dates. A post-death computation or alteration could not retroactively authorize detention. Harvanek and the Release-Record and Transfer Does knew of the conflicts but refused to verify or correct the underlying inputs.

58. Their conduct deprived Ross of liberty for the period proved, subjected him to punitive transfer and lethal OSP conditions, and caused emotional and physical injury, including death to the extent proved. The Estate seeks compensatory damages, punitive damages against the responsible individuals, costs, and § 1988 fees.

**COUNT III: 42 U.S.C. § 1983 – CIVIL CONSPIRACY** *(Estate against Harvanek, Chastang, Hayes, Killion, Mooney, Bills, Jordan, Henry, and the participating Release-Record and Transfer Does, Cell-Assignment and Observation Does, and Emergency-Response Does)*

59. The Estate incorporates the preceding paragraphs. The participating Defendants expressly or tacitly agreed and acted in concert to confine and punish Ross at OSP without authority, expose him to known danger while avoiding and falsely recording observations, or preserve a false appearance of recent discovery and timely rescue after catastrophic injury. Each participant

Exhibit 2

knowingly furthered the objective of the arrangement that participant joined through the defendant-specific acts alleged above.

60. The agreements may be inferred from coordinated acts and communications, shared access to the truth, departures from mandatory duties, mutually reinforcing accounts, and concealment. Each participant knew the essential nature and scope of the arrangement, knowingly joined and advanced it, and is liable for acts another member committed in furtherance of the same arrangement.

61. The conspiracies caused and prolonged the deprivations in Counts I and II and proximately caused Ross's loss of liberty, exposure to lethal danger, deprivation of protection and timely aid, physical and emotional injury, conscious pain and fear and death. The Estate seeks compensatory damages, punitive damages against the responsible individuals, costs and §1988 fees.

**COUNT IV: OKLAHOMA NEGLIGENCE AND GROSS NEGLIGENCE – ALTERNATIVE OGTCA AND INDIVIDUAL LIABILITY** *(Plaintiffs against State ex rel. ODOC for actionable within-scope torts and against each responsible individual Defendant for outside-scope torts)*

62. Plaintiffs incorporate the preceding paragraphs. State *ex rel.* ODOC, through employees acting within the scope of employment, owed the duties arising from their assigned responsibilities; alternatively, each outside-scope individual owed the applicable duties. Those duties required reasonable care in sentence and release administration, transfer, classification, housing, observation, security, emergency response, restraint, medical assessment, supervision, scene preservation, evidence handling, recordkeeping, truthful and prompt family notice, and preservation and disposition of remains.

63. Harvanek and the Release-Record and Transfer Does breached release, detention, and transfer duties; Chastang and the Cell-Assignment and Observation Does breached classification, observation, protection, and truthful-record duties; Chastang, Hayes, Killion, Mooney, Bills, Jordan, Henry, and the Emergency-Response Does breached emergency, restraint, assessment,

Exhibit 2

supervision, and intervention duties; Killion, Mooney, Stranahan, Hayes, Willbanks, Battles, and the Death-Scene and Investigation Does breached scene, evidence, custody, logging, authorization, and investigative duties; and Hall and the Family-Notification, Records, and Remains Does breached notification, record, family-control, and remains duties. Direct participation, supervision, ratification, assistance, or concerted action supports each breach.

64. The pre-death breaches proximately caused Ross's lost liberty, exposure to foreseeable assault, lost opportunities for protection and intervention, pain, fear, injury, death, and the beneficiaries' losses; his loss of liberty preceded and was independent of the assault. The post-death breaches injured Danielle by delaying and falsifying notice, obscuring facts, impairing investigation and informed decision-making, improperly handling human remains, and interfering with her rights to possess, control, view, and dispose of them. State *ex rel.* ODOC is liable for actionable within-scope conduct under § 153(A); each individual acting willfully, maliciously, corruptly, in bad faith, or otherwise outside the scope of employment is alternatively liable under § 153(C).

**COUNT V: WRONGFUL DEATH AND SURVIVAL – 12 O.S. §§ 1051 AND 1053**
*(Personal Representative against State ex rel. ODOC and Harvanek, Chastang, Hayes, Killion, Mooney, Bills, Jordan, Henry, and the participating pre-death Does)*

65. The Personal Representative incorporates the preceding paragraphs and alone maintains the statutory claims; Danielle asserts no separate individual wrongful-death claim. The constitutional violations and conspiracies, within-scope ODOC torts, and outside-scope individual torts caused or contributed to Ross's September 12, 2024, assault, injuries, and death. Had he survived, he could have sued for those injuries.

66. State *ex rel.* ODOC is liable for wrongful-death and survival damages attributable to actionable within-scope torts. The named pre-death individuals and Does are liable for their

direct constitutional violations, acts in furtherance of the constitutional arrangements they joined, failures to intervene, and outside-scope torts.

67. The Estate and beneficiaries seek all damages under §§ 1051 and 1053, including medical and burial expenses to the extent incurred, conscious pre-death physical and mental pain to the extent proved, loss of earnings and support, grief, loss of companionship, and other pecuniary and nonpecuniary losses allowed by law. This Count preserves the full statutory recovery for the underlying wrongs without limiting any other remedy.

**COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** *(Danielle Ross individually against Chastang, Hayes, Killion, Mooney, Stranahan, Hall, Bills, Jordan, Henry, Willbanks, Battles, and the participating Does)*

68. Danielle incorporates the preceding paragraphs. The named Defendants personally participated in, directed, approved, ratified, knowingly assisted in, or concealed the alleged intentional and concerted post-death course, or transmitted communications or records advancing it. That course included preserving a false recent-movement and rescue account; unnecessarily restraining, manipulating, or moving Ross; disturbing or incompletely recording the scene; mishandling or obscuring evidence; withholding notice; supplying a false transfer account or inconsistent death or discharge dates; altering or refusing to correct records; and initiating premature cremation steps.

69. In the setting of a mother's sudden loss of a child in State custody, that course exceeded all bounds of decency and was atrocious and intolerable. Each participant intended to cause severe distress or consciously and recklessly disregarded the near certainty that the conduct would cause it; acts furthering the post-death arrangement are attributable to its knowing participants.

70. The conduct directly caused Danielle severe shock, grief, anxiety, helplessness, and mental anguish and impaired her ability to grieve, investigate, and make decisions. Its intentional and

bad-faith nature placed it outside the scope of employment; Danielle seeks compensatory and punitive damages from every direct or concerted participant.

**COUNT VII: IMPROPER HANDLING OF HUMAN REMAINS AND INTERFERENCE WITH THE STATUTORY RIGHT OF CONTROL** *(Danielle Ross individually against State ex rel. ODOC under the within-scope theory and, under the outside-scope theory, against Killion, Mooney, Stranahan, Hall, Henry, the participating Death-Scene and Investigation Does, and the participating Family-Notification, Records, and Remaining Does)*

71. Danielle incorporates the preceding paragraphs. On information and belief, Ross left no disposition directive, pre-need funeral services contract, appointed representative, spouse, adult child, or other claimant with priority over Danielle under § 1158. As his surviving mother, she held, alone or with any other surviving parent, the personal right to control his remains and direct their disposition, subject to temporary lawful death-investigation custody. This personal claim is distinct from survival and wrongful-death claims.

72. Defendants cuffed and manipulated Ross after death was apparent and rigor mortis had set in; disturbed or moved his body without documented medical need or required authorization from OIG, the Medical Examiner, or law enforcement; failed to document the body's condition, location, and movement; delayed or falsified notice; obscured disposition records; and initiated nonconsensual cremation before Danielle could exercise control. These unnecessary, unauthorized, nonconsensual acts lacked legitimate medical, security, or investigative justification, were highly offensive to a reasonable person, and were committed intentionally or recklessly or, alternatively, with gross negligence. Within-scope and outside-scope theories are pleaded in the alternative.

73. State *ex rel.* ODOC is liable for actionable within-scope conduct under § 153(A); an individual acting willfully, maliciously, in bad faith, for purposes of concealment, or otherwise outside the scope of employment is liable under § 153(C). The conduct directly caused Danielle

Exhibit 2

severe anguish, loss of control over her son's remains, disruption of her grieving process, and other compensable personal injury.

**COUNT VIII: OKLAHOMA CIVIL CONSPIRACY** *(Plaintiffs against the individual Defendants who joined one or more identified concerted arrangements; State ex rel. ODOC is not a Defendant to this Count)*

74. Plaintiffs incorporate the preceding paragraphs. Two or more individuals expressly or tacitly agreed and combined to achieve unlawful objectives or lawful objectives by unlawful means through the detention and punitive-transfer, missed-observation and false-record, staged-response, and post-death scene, evidence, record, notification, and remains-concealment arrangements.

75. Harvanek advanced detention and transfer; Chastang advanced observation and response; Hayes, Killion, Mooney, Bills, Jordan, and Henry advanced response; and Killion, Mooney, Stranahan, Hall, Willbanks, and Battles advanced post-death concealment. The corresponding Does advanced their arrangements through identified functions. Each participant committed an overt act through participation, supervision, approval, ratification, assistance, recordkeeping, communication, restraint, movement, evidence handling, notification, or remains-related conduct.

76. The agreements furthered false imprisonment, unlawful detention, battery, unnecessary restraint, intentional infliction of emotional distress, improper handling of human remains, and interference with the statutory right of control. The pre-death arrangements caused Ross's injuries and the Estate's and beneficiaries' damages; the post-death arrangement caused Danielle's injuries. Each knowing participant is liable for acts furthering each arrangement that participant joined and for compensatory and punitive damages resulting from those acts.

## PUNITIVE DAMAGES

77. The individual Defendants' constitutional conduct and conspiracy participation reflected malicious intent or reckless or callous indifference to Ross's federal rights. Their outside-scope

Exhibit 2

conduct – including intentional restraint, falsification, concealment, improper handling of human remains, interference with the statutory right of control, and conspiracy – involved reckless disregard, malice, fraud, oppression, intentional harm, or life-threatening conduct. Federal law and 23 O.S. § 9.1 permit punitive damages against those individuals, not State *ex rel.* ODOC.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment against each responsible Defendant and the following relief:

(A) compensatory damages for Ross's lost liberty, physical and emotional injury, conscious pain and fear, and other surviving losses;
(B) wrongful-death damages for the statutory beneficiaries, recoverable by the Personal Representative;
(C) compensatory damages for Danielle's direct injuries under Counts IV, VI, VII, and VIII;
(D) compensatory damages against State *ex rel.* ODOC under Counts IV, V, and VII as Oklahoma law permits;
(E) joint and several liability of each conspirator for damages caused by acts furthering an arrangement that conspirator joined; and
(F) punitive and exemplary damages against responsible individuals, attorney fees under 42 U.S.C. § 1988, taxable costs, prejudgment and post-judgment interest, and all other appropriate legal or equitable relief.

Damages exceed 28 U.S.C. § 1332's jurisdictional amount; Plaintiffs demand no specific sum.

Richard C. Labarthe, OBA # 11393

Alexey V. Tarasov, OBA # 32926
**LABARTHE & TARASOV, P.A.**
100 N. Broadway Ave., Suite 1880
Oklahoma City, Oklahoma 73102
(405) 760-3323; Alternate telephone: (832) 623-6250
Mobile: (405) 410-5631; Facsimile: (405) 843-9685
richard@labarthelaw.com; alexey@tarasovlaw.com
**ATTORNEYS FOR PLAINTIFFS**

Exhibit 2